# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

DINAH MACHELLE BARRINGTON,    )
                              )

        **Plaintiff,**       )

                              )     **No. 3:13-01298**

**v.**                          )     **Judge Nixon/Brown**

                              )

**CAROLYN W. COLVIN,**       )
**ACTING COMMISSIONER**    )
**OF SOCIAL SECURITY,**      )

                              )

        **Defendant.**     )

**To: The Honorable John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 21) be **DENIED** and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on August 12, 2010 alleging a disability onset date of September 15, 1999. (Doc. 12, pp. 105-06, 113, 127, 138)[1] Plaintiff claimed that she is unable to work because of fibromyalgia, migraines, heart arrhythmia, and stomach problems. (Doc. 12, pp. 62-63, 142) Plaintiff's claims were denied initially on January 4, 2011 and again upon

---

[1] References to page numbers in the Administrative Record (Doc. 12) are to the page numbers that appear in **bold** in the lower right corner of each page.

reconsideration on April 25, 2011.  (Doc. 12, pp. 54-71)

Plaintiff requested a hearing before an administrative law judge (ALJ) on May 5, 2011. (Doc. 12, pp. 72-73)  A hearing was held on June 25, 2012 in Nashville before ALJ Michelle Thompson.  (Doc. 12, pp. 38-53)  Vocational expert (VE) Pedro Roman testified at the hearing. (Doc. 12, pp. 38, 49-52)  Plaintiff was represented by attorney Michael Dale at the hearing.  (Doc. 12, pp. 12, 104)

The ALJ entered an unfavorable decision on August 7, 2012.  (Doc. 12, pp. 9-27)  Attorney Dale filed a request with the Appeals Council on October 4, 2012 to review the ALJ's decision. (Doc. 12, pp. 7-8, 188-89)  The single issue presented to the Appeals Council was the ALJ's alleged failure to give the proper weight to the opinion of Dr. Lance Sherley, M.D.  (Doc. 12, p. 189)  The Appeals Council denied plaintiff's request on September 27, 2013, whereupon the ALJ's decision became the final decision of the Commissioner.  (Doc. 12, pp. 2-6)

Plaintiff, proceeding *pro se* and *in forma pauperis*, brought this action in district court on November 22, 2013.  (Doc. 1)  The matter was referred to the Magistrate Judge, following which the Magistrate Judge entered an order on February 7, 2014 instructing plaintiff to "file a motion for judgment on the administrative record supported by a brief within thirty (30) days of the date of entry of th[at] order."  (Doc. 13, p. 1)  Defendant subsequently filed a motion on April 11, 2014 that plaintiff show cause why this action should not be dismissed for failure to comply with the court's February 7th order.  (Doc. 17)  On April 16, 2014, the Magistrate Judge entered an order directing plaintiff to show cause why the Magistrate Judge should not recommend dismissal for failure to prosecute and obey the orders of the court or, in the alternative, to file a motion for judgment on the administrative record not later than May 5, 2014.  (Doc. 18)

Thereafter, on May 6, 2014, plaintiff filed a document (Doc. 21) that the Magistrate Judge

construed as a motion for judgment on the administrative record (Doc. 22). Defendant filed a response on July 18, 2014 to plaintiff's motion. (Doc. 30) Plaintiff did not reply. This matter is now properly before the court.

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Review of the medical evidence has been tailored to plaintiff's claim of error. Except as discussed below, the relevant details from the records of those medical providers who treated plaintiff are addressed in the analysis of plaintiff's claim for clarity, ease of reference, and to minimize unnecessary factual repetition.

Dr. Sherley, Premier Medical Group Family Medicine Clinic, was plaintiff's primary care physician at all times relevant to this action. Dr. Sherley wrote a letter on February 8, 2012 (Dr. Sherley's letter) addressed to "To Whom it May Concern." (Doc. 12, pp. 917-18) Dr. Sherley's letter is at the heart of this action. The letter is quoted below in relevant part.

> Ms. Barrington is a patient of mine at the Premier Medical Group Family Medicine clinic. I have been taking care of her for more than 5 years. This is a clinical summary of her chronic medical conditions and her ability to do work. Her past medical history includes fibromyalgia, migraine headache[s], chronic back pain, neck pain, vitamin D deficiency, dysesthesias,[2] tobacco use disorder, palpitations, diverticulosis, abdominal pain and endometriosis. Over the last couple of years she has seen multiple specialists to try and address these chronic conditions. She has seen a rheumatologist, neurologist, cardiologist, general surgeon, and pain management physician. Likewise, she has also seen and been evaluated by an orthopedist, neurosurgeon, and a gastroenterologist.
>
> She has been on a multitude of different medications to try and manage both the above-mentioned conditions and the symptoms that are related to those conditions. In many instances, the medications

---

[2] Dysesthesia – distortion of any sense, especially that of touch. *Dorland's Illustrated Medical Dictionary* 577 (32nd ed. 2012).

have caused intolerable side effects. It has been a difficult choice on her part to try to continue the medications and put up with the side effects or discontinue the medication and deal with the signs and symptoms of those conditions. Because of these medical rheumatologic and otrhopedic conditions, she has not been able to maintain employment. If she did have a job, I anticipate that she would miss multiple days of work secondary to her chronic/intolerable symptoms that are related to these conditions.

Often times, she is too ill to even come to scheduled doctor's appointments. Most of the above-mentioned conditions are chronic in nature and tend to either be stable or progressively get worse with time.

(Doc. 12, pp. 917-18)

## B. Transcript of the Hearing

Plaintiff testified that she last worked full time in the late 1990s and "a little bit in 2005." (Doc. 12, p. 42) Plaintiff testified that she had difficulty lifting stock, but not in understanding instructions. (Doc. 12, p. 42) She also testified that she was first diagnosed with fibromyalgia in "the late 1990s" by Dr. Sherley, and that she was able to work for [a]bout a year or so" afterward. (Doc. 12, p. 43) According to plaintiff, migraines, fibromyalgia, and chronic fatigue made her unable to work. (Doc. 12, p. 43)

Plaintiff testified that she "quit work to have a [complete] hysterectomy" in October 2006 because "the endometriosis had come back." (Doc. 12, p. 44) She also testified that, as far back as 2006 she could not wash dishes without help, that she "could fold some clothes" but not lift a laundry basket, that cooking even simple meals was difficult, and that she had to lie down 8 hours a day. (Doc. 12, pp. 44-45) Plaintiff testified further that, although she was able drive in 2006, there were days when her symptoms prevented her from doing so. (Doc. 12, p. 45) Finally, plaintiff testified that her condition was "about the same; maybe worse" at the time of the hearing as it was in 2006, and that she had not looked for work since 2006. (Doc. 12, pp. 45, 48)

The ALJ posed the following hypothetical – the first of four – to the VE following plaintiff's testimony:

> [A]ssume someone of the claimant's age, education and work experience who can lift, push, pull and carry up to 20 pounds occasionally, sit stand and/or walk six hours, can occasionally climb, balance, stoop, kneel, crouch and/or crawl. She would have to avoid concentrated exposure to extreme temperatures and she would have to avoid exposure to hazards. . . .

(Doc. 12, p. 49)  The VE testified that the hypothetical person could work as an "assembler [of] small products," "cashier two," and "finisher."  (Doc. 12, p. 50)

In the second hypothetical, the ALJ added the following limitations to the first hypothetical:

> [T]he person can understand and carry through simple and detailed tasks, can maintain concentration, persistence and pace for two hours at a time, can interact appropriately with others and can adapt to infrequent changes. . . .

(Doc. 12, p. 50)  The VE testified that the same jobs identified in the first hypothetical would be available.  (Doc. 12, p. 51)

The ALJ asked the VE to consider a third hypothetical in which the second hypothetical was viewed in the context of Dr. Sherley's letter, *i.e.*, that "due to pain and side effects of medication, [she] would miss work . . . at a rate of four days a month."  (Doc. 12, p. 51)  The VE testified that no work would be available.[3]  (Doc. 12, p. 51)

## C.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

---

[3]  The fourth hypothetical is not discussed because the ALJ determined that plaintiff had the Residual Functional Capacity to perform light work.  The fourth hypothetical pertained to work at the medium level.

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014). The record shows that the ALJ adhered to the five-step process.

### III. ANALYSIS

### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gentry*, 741 F.3d at 722 (internal citation omitted); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374 (internal citation omitted). In other words, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

### B. Claims of Error

Plaintiff's motion for judgment on the administrative record is unclear as to the claim(s) of error that she wishes the court to consider. The fragmented elements of plaintiff's motion seem to suggest that plaintiff's theory is that the ALJ erred in not giving the proper weight to the opinions

expressed in Dr. Sherley's letter. That inference has some support in the fact that counsel raised this issue – and no others – in his brief to the Appeals Council. (Doc. 12, pp. 188-89) For these reasons, the Magistrate Judge liberally construes plaintiff's motion to raise a single issue before the court, *i.e.*, that the ALJ erred in not giving proper weight to the opinions expressed by Dr. Sherley in his February 8, 2012 letter.

### 1. Whether the ALJ Erred in Not Giving Controlling Weight to Dr. Sherley's Letter

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d 365, 376 (6th Cir. 2013)(quoting 20 C.F.R. § 404.1527(c)(2)). However, the ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip*, 25 F.3d at 287. If the Commissioner does not give a treating-source opinion controlling weight, then the Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

Dr. Sherley's opinion as to the effect of plaintiff's medical limitations was addressed above at pp. 3-4. The ALJ wrote the following concerning that opinion:

> As for the opinion evidence, Dr. Sherley, the claimant's treating physician, has noted that the claimant would likely miss "multiple" days of work due to her many chronic impairments and failed

treatments. Dr. Sherley also indicated that the claimant's impairments are either stable or progressively getting worse with time (19F). Although a treating physician's opinion is generally entitled to great weigh under the Regulations (20 CFR 404.1527(d)(2) and 416.927(d)(2)), in the present case Dr. Shirley's conclusions are not supported by the preponderance of the evidence of record. As discussed above, objective diagnostic evidence cannot explain the reported severity of the claimant's symptoms, and the claimant herself has not been entirely compliant with prescribed treatment. Therefore, Dr. Shirley's opinion is given little weight.

(Doc 12, p. 19)  As shown above, the ALJ recognized that Dr. Sherley was a treating physician under the regulations.  Moreover, the ALJ gave good reasons for not giving Dr. Sherley's opinions controlling weight, reasons that would be clear to subsequent reviewers.  As shown below, the ALJ's decision also is supported by substantial evidence.

      a.    **Fibromyalgia**. Fibromyalgia is mentioned throughout the medical record.[4]  Dr. Sherley's records show that he diagnosed plaintiff with "possible fibromyalgia" in June 1998. (Doc. 12, p. 588)  Dr. Sherley characterized plaintiff as having "[p]robable fibromyalgia" on November 4, 1998, noting that he had "suspected fibromyalgia in the past."  (Doc. 12, p. 583)  Dr. Sherley repeated this "working" diagnosis of "probable fibromyalgia"several times between January 22, 2009 and January 20, 2010 (Doc. 12, pp. 219, 577, 712, 775), even though myalgia/arthralgia studies by the Premier Medical Group on April 23, 2009 were normal.  (Doc. 12, pp. 665-67, 750)

On December 10, 2009, more than a decade after first suspecting that plaintiff had fibromyalgia, Dr. Sherley decided that he "want[ed] [plaintiff] to see a rheumatologist b/c [he] would like them either to confirm the Dx and/or suggest another Dx so we can get her better."  (Doc. 12, p. 712)  Dr. Sherley stated in the same clinical note that he had done "an ANA screen on her [for

---

    [4]  Apart from the records discussed below, fibromyalgia is noted in the remainder of the record solely in the context of plaintiff's past medical history, unsupported one-time medical impressions, impressions carried forward from one medical record to another, or as the stated reason for plaintiff seeking treatment.

fibromyalgia] within the last 6 months or so. The screen came back positive, but the titers[5] ended up being less than 1:40, which was interpreted as being negative." (Doc. 12, p. 712)

Dr. Sherley referred plaintiff to Rheumatologist Dr. Mohammed Ali, M.D., Comprehensive Rheumatology Care, PLLC, in April 2010. Dr. Ali wrote on April 16, 2010 that plaintiff "ha[d] been worked up extensively including blood work" in February for fibromyalgia, an apparent reference to the earlier studies ordered by Dr. Sherley, and that those studies all were within normal limits. (Doc. 12, pp. 229, 232) Dr. Ali repeated "some" of Dr. Sherley's earlier "serologies." (Doc. 12, p. 233) The results also were within normal limits. (Doc. 12, pp. 233, 631-43) Dr. Ali's conclusion based on examining plaintiff, as well as Dr. Sherley's and his laboratory studies, was that plaintiff's "symptoms point[ed] towards chronic fatigue syndrome vs fibromyalgia," that she had only a vitamin D deficiency, and that she needed "to start doing some physical activity . . . ." (Doc. 12, pp. 230, 233) Dr. Ali repeated his assessment in his May 14, 2010 followup report. (Doc. 12, pp. 235-36)

Dr. Sherley "reviewed all the laboratory data," his and Dr. Ali's, with plaintiff on April 26, 2010. (Doc. 12, p. 766) In that review, Dr. Sherley concurred in Dr. Ali's assessment that "the only thing . . . abnormal was a decreased vitamin D level." (Doc. 12, p. 766) Inexplicably, however, Dr. Sherley wrote two months later that "[t]he rheumatologist [Dr. Ali] has come to the conclusion that she probably has fibromyalgia." (Doc. 12, p. 760) This statement not only misrepresents Dr. Ali's expert medical opinion, *i.e*, that plaintiff's "symptoms point[ed] towards chronic fatigue syndrome vs. fibromyalgia" and a vitamin D deficiency, his statement is not supported by objective medical evidence, nor is it consistent with his own April 26th note that the "only thing . . . abnormal" based

_____

    [5] Titer – '[T]he quantity of a substance required to produce a reaction with a given volume of another substance . . . ." *Dorland's* at p. 1932.

9

on Dr. Ali's report "was a decreased vitamin D level." (Doc. 12, p. 766)

The laboratory studies relied on by Drs. Sherley and Ali comprise the only objective medical evidence in the record pertaining to plaintiff's fibromyalgia claim. As noted above, the studies were within normal limits. Moreover, as interpreted by Dr. Ali, an expert in the field of rheumatology whose expert opinion Dr. Sherley sought, the objective medical evidence does not support Dr. Sherley's diagnosis of fibromyalgia. In short, this evidence does not support Dr. Sherley's opinion that plaintiff is unable to work because of fibromyalgia.

   **b.     Migraine Headaches.** Plaintiff completed the Tennessee Department of Human Services Headache Questionnaire (the headache questionnaire) on November 13, 2010, three months after she filed for benefits. (Doc. 12, p. 164) In it, plaintiff claims that she had suffered from migraines for about 20 years, *i.e.*, that she had them "sometimes weekly, at least 2 a month," that "[t]hey started in about 1990," and that they lasted "all day" when she had them.[6] (Doc. 12, p. 164)

Neurologist Dr. Blaise Ferraraccio, M.D., Premier Medical Group, noted on June 23, 1999 that plaintiff represented to him that she had her "first ever migraine about 2 months ago," *i.e.*, in March 1999. (Doc. 12, p. 414) Dr. Ferraraccio made a point to note that plaintiff claimed to have "never had a headache like this before, in fact, she has no history of any significant headaches." (Doc. 12, p. 414) More than ten years later, plaintiff represented to neurologist Dr. Rejane Lisboa, M.D., Tennessee Neurology Specialists, on August 13, 2009 that she had experienced "severe bilateral headaches" for eleven years, *i.e.*, beginning sometime in the latter half of 1998. (Doc. 12, p. 898) Plaintiff represented to Dr. James Johnson, M.D., Sports Medicine Center, on November 29, 2010 that her headaches "[s]tart[ed] in January 2009 . . . ." (Doc. 12, pp. 877-78)

_____

[6] Except as discussed below, plaintiff's alleged migraines are mentioned in the medical records only in the context of past medical history, unsupported one-time medical impressions, impressions carried forward from one medical record to another, and/or as the stated reason for plaintiff seeking treatment.

In his handwritten clinical notes, Dr. Sherley characterized plaintiff's migraines as "occasional" on June 17, 2008, and as "mild infrequent" approximately seven months later on January 14, 2009. (Doc. 12, pp. 791, 803) On February 26, 2009, Dr. Rohit Patel, Tennessee Oncology, PLLC, also characterized plaintiff's headaches as "occasional." (Doc. 12, p. 214) Dr. Lisboa noted on April 20, 2010, three months before plaintiff filed for benefits, that her migraines were "rare, not bothering." (Doc. 12, p. 896) Dr. Lisboa also characterized plaintiff's migraines as "infrequent episodes" on every occasion that he treated her in 2009 and 2010. (Doc. 12, pp. 885, 890, 893, 895, 901) Dr Ali reported on May 14, 2010, the month after Dr. Lisboa characterized her migraines as "rare, not bothering," that plaintiff had two migraines that prior January, but none since. (Doc. 12, pp. 229, 232, 235) Thereafter, on June 1, 2010, Dr. Lisboa noted that plaintiff had "no migraines since [her] last visit" (Doc. 12, p. 894), *i.e.*, on April 20, 2010 (Doc. 12, pp. 896-97), on September 20, 2010 that she only had "one migraine episode since [her] last visit" three and one-half months earlier in June (Doc. 12, p. 892), and on December 2, 2010 that she had "2 migraine episodes since [her] last visit" two and one-half months earlier in September (Doc. 12, p. 884). Given that the records of Drs. Ali and Lisboa overlap in 2010, the record shows that plaintiff had a migraine not more often than an average of one every two and one-half months.

In addition to the clinical records of Drs. Ferraraccio, Johnson, Sherley, Rohit Patel, and Lisboa above, the medical evidence includes CT scans ordered by Dr. Sherley of plaintiff's head/brain on June 18, 1999 and again January 8, 2009, both following complaints of headaches. (Doc. 12, pp. 837, 848-49) Both scans were negative. These CT scans are the only objective medical evidence in the record pertaining to plaintiff's migraines.

Giving plaintiff the maximum benefit of the doubt, plaintiff's claim in the headache questionnaire that her migraines "started in about 1990" is – at best – *inconsistent* with the medical

record by not less than eight years in the case of her representations to Drs. Ferraraccio and Lisboa, and not less than eighteen years in the case of Dr. Johnson. Plaintiff's claim in the headache questionnaire that she had migraines "sometimes weekly, at least 2 a month" is again *inconsistent* – at best – with the records of least five health care providers, one of whom – Dr. Sherley – is the treating source whose opinion is the subject of this action. Finally, there is no objective medical evidence that plaintiff's alleged migraines are the result of any medically determinable cause. In sum, this evidence does not support Dr. Sherley's opinion that plaintiff is unable to work because of migraines.

       **c.** **Chronic Back Pain.** A whole-body bone scan ordered by Dr. Sherley on May 19, 1998 was "essentially within limits," revealing only a "suggestion of an extreme[ly] subtle thoracic curve . . . ." (Doc. 12, pp. 590, 850) A bone scan on June 10, 1998 revealed a "subtle increase activity in the thoracic curve . . . ." (Doc. 12, p. 591) X-rays of plaintiff's lumbar spine on October 17, 2003 showed no abnormalities. (Doc. 12, p. 847) X-rays of plaintiff's back on February 10, 2004 showed "evidence of degenerative disc disease in the thoracic and lumbar spine." (Doc. 12, p. 846)

       X-rays of plaintiff's lumbar spine on January 27, 2005 compared to the February 10, 2004 x-rays above showed the following:

> No significant interval change in the appearance of the lumbar spine with mild straightening of lumbar lordosis,[7] but normal alignment of all vertebral bodies. No significant disc space narrowing. There is minimal . . . osteophytosis[8] at T12-L1 and L5-S1. The pedicles[9]

---

[7] Lordosis –the curve of the vertebral column as seen from the side. *Dorland's Illustrated Medical Dictionary* 1074 (32 ed. 2012).

[8] Osteophytosis – the formation of abnormal bony outgrowths. *Dorland's* at p. 1348.

[9] Pedicle – extensions of the vertebrae. *Dorland's* at pp. 1400-01.

and posterior elements are intact. Bone mineralization is normal.

(Doc. 12, p. 845) The reading radiologist's impression of the x-rays was "[s]table minimal multilevel lumbar spondylosis."[10] (Doc. 12, p. 845) A MRI of plaintiff's lumbar spine on May 25, 2005 revealed "evidence of degenerative disc disease with broad-based disc bulging at the L4-5 and L5-S1 levels" with apparent "associated edema . . . at the L5 level . . . ." (Doc. 12, p. 390) A CT scan on June 27, 2006 revealed "mild changes of the degenerative disc disease in the thoracic spine." (Doc. 12, p. 841)

On June 22, 2009, Dr. Sherley wrote: "Thoracic curvature is/has no abnormality. Lumbar curvature is/has no abnormality." (Doc. 12, p. 739) Dr. Sherley wrote on January 20, 2010: "Thoracic curvature is/has no abnormality. Lumbar curvature is/has no abnormality. No scoliosis. Spine is positive for . . . tenderness . . . [t]horacic palpitation reveals bilateral tenderness . . . ." (Doc. 12, p. 776) On February 26, 2010, Dr. Sherley wrote: "diffuse tenderness throughout the entire thoracic and lumbar spine to palpitation. This is mild in my observation." (Doc. 12, p. 773) On May 14, 2010, Dr. Sherley wrote: "Inspection [of the spine] reveals no abnormality . . . Normal flexion. Normal extension. Normal later flexion. Normal rotation." (Doc. 12, p. 764)

X-rays of plaintiff's thoracic spine on October 6, 2010 revealed "[m]ild scoliosis," which was characterized as possibly "partially positional," "mild degenerative [disc] change," and the "remaining visualized . . . osseous[11] structures appear unremarkable for age and technique," with no other "focal abnormality . . . appreciated." (Doc. 12, p. 860) X-rays that same day of plaintiff's lumbar spine revealed: "mild degenerative disc changes . . . new vs. more apparent than on the comparison. Osseous alignment is grossly anatomic. The remaining visualized soft tissues and

---

[10] Spondylosis – degenerative joint disease. *Dorland's* at p. 1754.

[11] Osseous – of the nature or quality of bone. *Dorland's* at p. 1343.

osseous structures appear stable and/or unremarkable for age." (Doc. 12, p. 861) The radiologist characterized the "[d]egenerative disc changes" as "mild-to-moderate[ly] sever[e]," but an "otherwise, stable and unremarkable examination . . . ." (Doc. 12, p. 861) Dr. Sherley wrote the following on regarding these x-rays: "x-rays of [the] thoracic and lumbar spine reveal some minimal arthritis-type changes [but] otherwise unremarkable." (Doc. 12, p. 778) On October 7, 2010, Dr. Sherley wrote: "Mild arthritis-type changes of her upper back, mild scoliosis. Lower back is remarkable for degenerative disc disease." (Doc. 12, p. 706)

Neurologist, Dr. Joseph Kosinski, M.D., Premier Medical Group, examined plaintiff on a "follow-up" for back pain on October 27, 2009. (Doc. 12, pp. 718-19) Plaintiff represented that her back pain was "worsening" and that it "occur[red] persistently." (Doc. 12, p. 718) Dr. Kosinski noted the following in his clinical notes: "Inspection reveals no abnormality. . . . Normal flexion. Normal extension. Normal lateral flexion. Normal rotation. Negative straight leg raising. Negative elevated leg test. . . . I think her back . . . [is] from her fibromyalgia." (Doc. 12, p. 719)

Dr. Kosinski treated plaintiff for back pain again on May 14, 2010. (Doc. 12, pp. 763-65) Although plaintiff again represented that "[t]he problem is worsening . . . [and] . . . [i]t occurs persistently," Dr. Kosinski reported "[o]nset . . . 2 Month(s) ago." (Doc. 12, p. 763) Dr. Kosinski went on to note that, although plaintiff complained of "tenderness" in her back, inspection "reveal[ed] no abnormality . . . Normal flexion. Normal extension. Normal lateral flexion. Normal rotation." (Doc. 12, p. 764)

Dr. Johnson noted on November 29, 2010 that plaintiff had "a MRI of her lumbar spine that shows spondylosis." (Doc. 12, pp. 877-78) Dr. Johnson also noted that he reviewed the "MRI of the lumbar spine . . . and . . . [it] is normal essentially except for spondylosis multilevel." (Doc. 12, p. 878) Dr. Johnson repeated his assessment of the MRI that plaintiff's lumbar spine is normal

except for spondylosis on May 25, 2011. (Doc. 12, p. 939)

The medical evidence supports the conclusion that plaintiff has mild scoliosis, mild thoracic degenerative disc change, and mild-to-moderate degenerative disc changes of the lumbar spine. The record also establishes that plaintiff's lumbar spine is stable and otherwise normal, that plaintiff's reported back pain was not constant, and that her back pain was mild. This evidence does not support Dr. Sherley's contention that plaintiff is unable to work due to back pain.

**d.** **Neck pain.** Plaintiff presented to Dr. Sherley on February 10 and 19, 1999 with "a 'lump' o[n] the right side of her neck . . . that [wa]s painful [and] seem[ed] to make her neck stiff." (Doc. 12, pp. 573, 576) Subsequent imagery of plaintiff's neck on February 24, 1999 was a "[n]ormal study." (Doc. 12, p. 851)

Plaintiff reported to Dr. Sherley on June 11, 1999 that "thought she might have slept on her pillow wrong," woke up "with what she felt was a crick in her neck," and complained that it was "har[d] to turn her neck back and forth." (Doc. 12, p. 565) Dr. Sherley ordered a CT scan on June 18, 1999. (Doc. 12, p. 848) The scan was negative. In his handwritten notes, Dr. Sherley reported on May 27, 2008 that plaintiff's neck "is much better now." (Doc. 12, p. 805)

Plaintiff complained to Dr. Johnson on November 29, 2010 that she had been unable to "move her neck and her legs" after having surgery earlier that month to remove a lipoma in the vicinity of her lower spine. (Doc. 12, p. 877) Dr. Johnson made no findings as to plaintiff's neck.

Apart from the records noted above, reference to plaintiff's neck in the remainder of record is based on examination and reported repeatedly in the following general terms/phrases: "normal," "full range of motion," "unremarkable," "supple," "no masses or nodes," "symmetrical," etc. In those instances where these specific terms/phrases are not used, similar ones are.

The evidence summarized above constitutes the sum total of the medical evidence pertaining

to plaintiff's neck.  This evidence does not support Dr. Sherley's opinion that plaintiff is unable to work because of her neck.

 **e.** **Vitamin D deficiency.** As previously discussed above at pp. 9-10, Dr. Ali determined that plaintiff had a vitamin D deficiency, and Dr. Sherley concurred.  Beyond that, the references in the medical record pertaining to plaintiff's vitamin D deficiency are in the context of the fact that she was prescribed a single 50,000 IU vitamin D capsule weekly.  There is nothing in the medical record that shows, or from which it may reasonably be inferred, that plaintiff is unable to tolerate the prescribed weekly vitamin D supplement.  In short, there is no evidence in the record, objective or otherwise, that support's Dr. Sherley's assertion that plaintiff's vitamin D deficiency makes her unable to work.

 **f.** **Dysesthesia.** Dr. Lisboa treated plaintiff for dysesthesia during the period August 2009 and December 2010.  (Doc. 12, pp. 884-902)  Dr. Lisboa noted in April, June, September, November, and December that there were "[n]o objective findings on exam," in June, September, November and December that she was tolerating her medication well, and in November that she "wishe[d] to proceed with the 4 extremities EMG."[12]  (Doc. 12, p. 890)  Plaintiff's neurological examination on November 5, 2010 prior to the EMG was normal.  (Doc. 12, pp. 885, 889-90)  The EMG completed on December 2, 2010 was a "normal study" without neuropathy[13] or radiculopathy.[14] (Doc. 12, pp. 884-85, 889-90, 892-94)  This medical evidence does not support Dr. Sherley's opinion that plaintiff's alleged dysesthesia makes her unable to work.

 **g.** **Tobacco Use Disorder.** Plaintiff is identified throughout the medical record as

---

[12]  EMG (electromyogram) – an electrodiagnostic technique for recording the extracellular activity of muscles at rest.  *Dorland's* at p. 602.

[13]  Neuropathy – a functional disturbance in the peripheral nervous system.  *Dorland's* at 1268.

[14]  Radiculopathy – disease of the nerve roots.  *Dorland's* at p. 1571.

having smoked a pack to a pack-and-a-half of cigarettes a day for more than twenty five years.  Of her many doctors, however, only Dr. Lisboa, actually diagnosed plaintiff with "tobacco use disorder," although others advised/counseled her many times to quit smoking.  (Doc. 12, pp. 885, 890, 893, 895, 897, 901) That said, neither Dr. Lisboa nor any other many physicians who treated plaintiff over the years ever attributed any limitations to plaintiff's ability to function because she smoked.  In sum, the record is devoid of any evidence, objective or otherwise, that supports Dr. Sherley's assertion that plaintiff is unable to work because she smokes.

  **h.**   **Palpitations.**  Dr. Sherley diagnosed plaintiff with heart palpitations in 1997.  (Doc. 12, p. 598)  On May 11, 1998, he reported that plaintiff's palpitations "[we]re intermittent in nature . . . ."  (Doc. 12, p. 598)  An in-clinic EKG on May 11 was normal.  (Doc. 12, p. 598)  An echocardiogram on May 19, 1998 was normal.  (Doc. 12, p. 630)  Another echocardiogram on June 10, 1998 was normal as well.  (Doc. 12, p. 590)

  On January 22, 1999, Dr. Sherley characterized plaintiff's palpitations as "not really that frequent."  (Doc. 12, p. 577)  He went on to note that, prior to November 4, 1998, they "seem[ed] to have a direct correlation with her menstrual cycling," *i.e.*, "they seem[ed], to be directly related to menses and with no other complaints . . . [u]sually start[ing] about one week prior to the onset of menses and . . . continu[ing] . . . until she finishes her period."  (Doc. 12, p. 583)  Two-plus months later on January 22, 1999, Dr. Sherley ordered a 24-hour Holter monitor[15] because of plaintiff's complaint of palpitations.  (Doc. 12, p. 577)  It was normal.  (Doc. 12, p. 193)

  Dr. Sherley ordered another 24-hour Holter monitor on October 26, 2005 in response to plaintiff's continued complaints of palpitations.  (Doc. 12, p. 385)  Again, the results were normal.  A CT scan on June 27, 2006 revealed "no acute cardiopulmonary disease."  (Doc. 12, p. 841)

---

[15]  Holter monitor – a type of ambulatory electrocardiogram monitor.  *Dorland's* at pp. 588, 1175.

Cardiologist Dr. J. David Amlicke, M.D., Gateway Medical Group, first treated plaintiff in May 2008. (Doc. 12, pp. 318-45) A 24-hour Holter monitor ordered by Dr. Amlicke on May 6, 2008 revealed "[e]xtra beats from [the] lower chambers [with] . . . [one] irreg[ular] rhythm . . . ." (Doc. 12, pp. 338, 622) The report was otherwise normal. Dr. Amlicke examined plaintiff on May 20, 2008 for daily "intermittent sharp, stabbing, left parasternal chest discomfort . . . ." and "intermittent palpitations/skipped beats . . . ." (Doc. 12, p. 337) The examination and EKG were normal. (Doc. 12, pp. 337-38) A May 24, 2008 EKG revealed "mild global left ventricle hypokinesis,"[16] but otherwise the scan was within normal limits. (Doc. 12, pp. 318, 320, 852) An exercise Sestamibi study[17] on June 5, 2008 was a "normal study." (Doc. 12, pp. 318, 320) Dr. Amlicke examined plaintiff on June 16, 2008, again for "intermittent, sharp, stabbing left precordial chest discomfort . . . [and] . . . occasional palpitations." (Doc. 12, p. 335) Dr. Amlicke opined that the pain was "noncardiac in origin, possibly related to GERD." (Doc. 12, p. 335) Dr. Amlicke also reported that plaintiff had only "occasional palpitations." (Doc. 12, p. 335) In his handwritten notes on June 17, July 22 and 25, 2008, Dr. Sherley reported that plaintiff's palpitations were better and the frequency reduced after taking Metoprolol. (Doc. 12, pp. 780, 799, 801, 803) Dr. Amlicke reported a normal physical examination on November 17, 2008. (Doc. 12, p. 322) In that report, Dr. Amlicke concluded that plaintiff "does not have evidence of active cardiovascular disease." (Doc. 12, p. 322)

Chest x-rays ordered by Dr. Sherley on February 9, 2009 were negative. (Doc. 12, p. 836) A 24-hour Holter monitor ordered by Dr. Sherley on May 13, 2009 revealed "lots of extra beats from upper chambers of the heart, but no bad rhythm." (Doc. 12, p. 602) On June 15, 2009, Dr. Sherley

---

[16] Hypokinesia – abnormally decreased function or activity. *Dorland's* at p. 903.

[17] Sestamibi Study – stress test for those who cannot use a treadmill. *Dorland's* at pp. 1221, 1410, 1700.

again described plaintiff's palpitations as "occur[ring] occasionally." (Doc. 12, p. 741) Dr. Sherley also noted that plaintiff had gone to the ER at Vanderbilt the prior week, and the evaluation at Vanderbilt, including EKG and associated labs, was negative. (Doc. 12, p. 741)

Dr. Amlicke ordered a "left heart catheterization, selective angiography,[18] [and] left ventriculogram[19]" on July 29, 2009. (Doc. 12, pp. 290, 295-317) A chest x-ray prior to the procedure was normal. (Doc. 12, pp. 309, 333) Apart from some "minimal . . . irregularities," the catheterization showed that plaintiff's heart was otherwise normal and free from "significant disease." (Doc. 12, pp. 312-313) Subsequent chest x-rays on November 12, 2009 also revealed "no acute cardiopulmonary process . . . ." (Doc. 12, p. 859)

On February July 7, 2010, Dr. Rohit Patel noted that plaintiff claimed to have "occasional . . . heart fluttering." (Doc. 12, p. 214) A 24-hour Holter monitor ordered by Dr. Sherley on July 9, 2010 showed "elevated PVC[20] couplet count." (Doc. 12, p. 612) On August 17, 2010, Dr. Amlicke characterized plaintiff's palpitations as "intermittent." (Doc. 12, p. 318) Dr. Amlicke ordered an echocardiogram on September 9, 2010. (Doc. 12, pp. 271-274) The result was normal. A nuclear stress test on August 23, 2010 was normal as well. (Doc. 12, pp. 275-76)

The medical evidence shows that plaintiff does experience palpitations. However, the results of objective testing during the time frame addressed above support the observations of Drs. Sherley, Amlicke, and Rohit Patel that plaintiff experiences heart palpitations/flutters only occasionally, that they are mild, and not due cardiovascular disease. This evidence does not support Dr. Sherley's

---

[18] Angiography – the radiographic visualization of blood vessels. *Dorland's* at p. 84.

[19] Ventriculogram – a radiograph of the ventricles of the heart. *Dorland's* at p. 2048.

[20] PVC (Premature ventricular contraction) – PVCs "are extra, abnormal heartbeats . . . sometimes causing [one] to feel a flip-flop or skipped beat in [one's] chest. Premature ventricular contractions are very common – they occur in most people at some point." *Www.mayoclinic.org/diseases-conditions/premature-ventricular-contractions/basics/definition/con-20030205*.

opinion that plaintiff's palpitations render her unable to work.

     **i.**     **Diverticulosis.**  A colonoscopy performed by internist/gastroenterologist Dr. Anil Patel, GI Specialists of Clarksville, on February 17, 2005 was normal apart from moderate internal hemorrhoids and a recommendation for a high fiber diet. (Doc. 12, p. 350) A CT scan ordered by Dr. Sherley on June 27, 2006 was "unremarkable" as to the "visualized portions of the upper abdomen." (Doc. 12, p. 841) On February 26, 2009, Dr. Rohit Patel described plaintiff's abdominal pain as "occasional." (Doc. 12, p. 214) Imaging of plaintiff's abdomen ordered by Dr. Sherley on May 19, 2009 was negative. (Doc. 12, p. 855) A CT scan of plaintiff's abdomen ordered by Dr. Sherley on August 20, 2009 revealed no abnormality. (Doc. 12, p. 833)

     Gastroenterologist Dr. Edwin Glassell, M.D., Clarksville Gastroenterology & Endoscopy Center, ordered an EGD[21] on August 25, 2010 that "reveal[ed] nonerosive gastritis," but the test was otherwise normal. (Doc. 12, pp. 348, 995) On September 14, 2010, Dr. Sherley concurred with the results of the earlier EGD. (Doc. 12, p. 707) A CT scan of the abdomen and pelvis on June 9, 2011 showed "colonic wall thickening suggestive of infectious colitis versus UC."[22] (Doc. 12, p. 995) A second colonoscopy ordered by Dr. Anil Patel on September 1, 2011 revealed "scattered left colon diverticulosis," but was otherwise normal. (Doc. 12, p. 995) Plaintiff represented to Dr. Glassell on September 22, 2010 that her abdominal pain "occurs intermittently." (Doc. 12, p. 346) A barium enema on November 22, 2011 showed "colonic diverticulosis." (Doc. 12, p. 995) Dr. Glassell diagnosed plaintiff with irritable bowel syndrome on April 9, 2012. (Doc. 12, p. 995)

     Surgeon, Dr. Michael Heuman, M.D., Clarksville Medical Specialists, reported on January

---

[21] EGD (esophagogastroduodenoscopy) – endoscopic examination of the esophagus, stomach, and duodenum. *Dorland's* at pp. 596, 648.

[22] UC – ulcerative colitis. *Www.mayoclinic.org/diseases-conditions/ulcerative-colitis/basics/definition/con-20043763*.

16, 2012 that plaintiff described her abdominal pain as "crampy" and that it "ha[d] been on and off occurring since May 2011." (Doc. 12, p. 989) Reviewing the radiology reports in the paragraph above, Dr. Heuman wrote that the prior "ultrasound of the right upper [abdominal] quadrant was normal . . . [t]he CT scan showed suspected colitis . . . [and] . . . the barium enema showed diverticulosis." Based on examination and his review of these reports, Dr. Heuman ultimately concluded that plaintiff's abdominal pain did "not appear to be related to diverticulitis," and sent plaintiff for a HIDA[23] scan to "determine if [plaintiff] need[ed] a repeat colonoscopy and EGD versus a recommendation for fiber." (Doc. 12, p. 990)

Dr. Heuman saw plaintiff next on March 16, 2012. (Doc. 12, p. 987) The earlier HIDA scan was normal. (Doc. 12, p. 987) During this encounter, plaintiff expressed her desire to undergo elective surgery, *i.e.*, exploratory laparoscopy,[24] to rule out surgical correctable causes for her chronic abdominal pain. (Doc. 12, p. 987) Exploratory laparotomy was performed on April 3, 2012 during which her appendix and gall bladder were removed.[25] (Doc. 12, p. 986) "The appendix and gallbladder were pathologically normal." (Doc. 12, p. 986)

Plaintiff told Dr. Heuman on April 13, 2012 that "she [wa]s feeling much better since her surgery," that she "[wa]s very happy with her results," that she "[wa]s tolerating a regular diet," that she has normal bowel function, is returning to normal activity, and has a good appetite." (Doc. 12, p. 986) On April 24, 2012, Dr. Glassell diagnosed plaintiff with irritable bowel syndrome (IBS) –

---

[23] HIDA (hepatobiliary iminodiacetic acid) – hepato – pertaining to the liver; iminodiacetic acid – a simple acid containing an imino group. HIDA scan is used to visualize the hepatobilary tract. *Dorland's* at pp. 846, 859.

[24] Laparoscopy – examination of the interior of the abdomen by means of a laparoscope – an instrument comparable to an endoscope – inserted into the peritoneal cavity to inspect it. *Dorland's* at p. 1005.

[25] The record suggests that this was plaintiff's second laparotomy for endometriosis. Surgeon Dr. Francis Pease, M.D., Premier Medical Group, to whom Dr. Sherley referred plaintiff for a surgical consult regarding fibrolipomas in 2001, wrote in an office note dated June 27, 2001 that plaintiff had a past surgical history of a "laparotomy for endometriosis." (Doc. 12, p. 411) Dr. Ali's note of April 16, 2010 indicates that the date was 1994. (Doc. 12, p. 232)

not diverticulitis – and recommended that she take a probiotic to relieve her symptoms. (Doc. 12, pp. 995-96)

As shown above, the medical evidence does not conclusively support a diagnosis of diverticulitis. However, whether from diverticulitis, IBS, or some other reason related to the abdomen, plaintiff's abdominal pain occurred only occasionally/intermittently. This evidence does not support Dr. Sherley's opinion that plaintiff is unable to work due to diverticulitis/abdominal pain.

**j.     Abdominal Pain.**  See ¶ i above.

**k.     Endometriosis.**  Dr. Sherley wrote on August 12, 1998 that plaintiff's "[p]ast medical history [wa]s remarkable . . . for endometriosis . . . ." (Doc. 12, p. 588) The following year on August 27, 1999 Dr. Sherley noted that plaintiff had been diagnosed for endometriosis "by another physician." (Doc. 12, p. 560) A pathology report dated September 11, 1999 ordered by Dr. Sherley was negative for endometrial cells. (Doc. 12, p. 436) A seven-plus year gap in Dr. Sherley's records regarding endometriosis follows the 1999 pathology report and his later records discussed below.

Dr. Sherley makes no reference to endometriosis in his handwritten records covering the period May 6, 2008 to May 7, 2009. (Doc. 12, pp. 780-809) Although Dr. Sherley notes "[e]ndometriosis, site unspecified" as a "chronic problem" at least seventeen times from September 14, 2009 to October 6, 2010 (Doc. 12, pp. 544, 707, 710, 712, 715, 718, 720, 723, 755, 757, 760, 763, 766, 769, 772, 775, 777), there is no medical evidence, objective or otherwise, that supports Dr. Sherley's contention that endometriosis was a "chronic problem."

In addition to the foregoing, Dr. Pease noted on June 27, 2001 in plaintiff's past surgical history that she had undergone "a laparotomy for endometriosis" in 1989. (Doc. 12, p. 411) Dr. Rohit Patel reported on February 26, 2009 that plaintiff previously had "[l]aser surgery for

endometriosis."[26]  (Doc. 12, p. 215)  Dr. Ali noted on April 16, 2010 that plaintiff had undergone surgery in 1994 for endometriosis.  (Doc. 12, p. 232)  Apart from these additional historical references in the records of other doctors, there are no records that actually pertain to these surgeries, or to endometriosis.

As discussed above at p. 21S, Dr. Heuman performed an exploratory laparotomy on plaintiff on April 3, 2012 – the year after the administrative hearing – "to rule out surgical[ly] correctable causes of her "chronic abdominal pain."  (Doc. 12, pp. 986-67)  Endometriosis is a "surgical[ly] correctable cause" of abdominal pain.  Moreover, this was the same procedure that plaintiff underwent for endometriosis in 1989.  Although Dr. Heuman sought specifically to eliminate diverticulitis as the cause for plaintiff "chronic abdominal pain," he also was looking for any other surgically correctable causes for her abdominal pain.  Dr. Heuman made no reference to the presence of endometrial cells, which he likely would have had they been present.

Apart from the evidence discussed above, the only evidence pertaining to plaintiff's endometriosis claim is her testimony at the hearing that she had "a [complete] hysterectomy" in October 2006 because "the endometriosis had come back."  There are no records before the court that pertain to plaintiff's hysterectomy.   In other words, there is nothing in the record that would permit the court to conclude that plaintiff's hysterectomy was because "the endometriosis had come back" as opposed to one of the many other possible reasons that a woman might have to undergo a hysterectomy.

As shown above, there is no medical evidence, objective or otherwise, that plaintiff had endometriosis at the times relevant to this action.  Consequently, the evidence does not support Dr. Sherley's opinion that plaintiff is unable to work because of endometriosis.

---

[26]  It cannot be determined from the record if the laser surgery to which Dr. Rohit Patel refers is the 1998 laparotomy to which Dr. Pease referred or another procedure.

**l.       Medication Side Effects.**  There are countless examples in the record of plaintiff's subjective complaints over the years that one prescription medication or another did not work, that it/they did not work as well as something else, that it/they made her feel worse, or that it/they caused adverse side effects.  Although the record shows that medical intervention followed in each instance to address/resolve the alleged problem(s), Dr. Sherley insists in his February 8, 2012 letter that, "[i]n many instances, the medications have caused intolerable side effects" the inference being that the alleged side effects would adversely affect her ability to work.  (Doc. 12, p. 917)

The Magistrate Judge notes as an initial matter that, although plaintiff checked the box labeled "Yes" in the October 1, 2010 Adult Function Report in response to the Question, "Do you currently take any medicines for your illnesses, injuries, or conditions," plaintiff did not check the box labeled "Yes" corresponding to the follow-on question, "If 'YES,' do any of your medicines cause side effects?" (Doc. 12, p. 160)  Neither did she list any medications/side effects in the several spaces provided in that portion of the report.  (Doc. 12, p. 160)  Additionally, either the box labeled "No side effects" was checked in form-treatment records throughout the period of time at issue or, if not checked, none of the boxes corresponding to any of the listed side effects was checked – or a specific note was made that there were no side effects in narrative-form treatment records.  (Doc. 12, pp. 256, 261, 588, 919, 923, 928, 930, 934, 938, 942, 946, 972, 978, 982)  These records cover the period August 12, 1998 to September 6, 2011.  Eight of these entries pertaining to no side effects were made in 2011, the year before Dr. Sherley's letter.

Assuming for the sake of argument that not all of the side effects of plaintiff's medications were resolved, the record shows that plaintiff was taking opiod pain killers like Tramadol, Demerol, Oxycodone, Hydrocodone, Darvocet, Prozac, Morphine, etc., throughout the period at issue together with a cocktail of antidepressants, sleep aids, and muscle relaxers such as Amitriptyline, Gabapentin, Bupropion, Methocarbamol, Imipramine, Robaxin, etc.  The opiates, all of which have possible side

24

effects, figured prominently in plaintiff's treatment.  As shown below, there is substantial evidence in the record that plaintiff abused opiod pain killers, as well as her other medications, the upshot of which is that plaintiff's failure to follow these prescriptions at least contributed to the side effects she claimed to have experienced.

As early as November 4, 1998, Dr. Sherley noted that plaintiff "ran out of imipramine before it was time to have it refilled . . . ."  (Doc. 12, p. 583)  On August 28, 2007 plaintiff called Dr. Sherley's office for a refill of Tramadol.  (Doc. 12, p. 457)  The prescription had been given on July 5, 2007 with three refills, but plaintiff ran out on August 28, 2007.  (Doc. 12, p. 457)  On November 1, 2007, plaintiff called for another refill on Tramadol because she had been taking 8 per day instead the amount prescribed.  (Doc. 12, p. 452)  Her prescription had lasted only 15 days.  The pharmacist told Dr. Sherley's office upon inquiry that plaintiff had been "getting Tramadol refills frequently." (Doc. 12, p. 453)

Dr. Kosinski wrote on October 27, 2009 that plaintiff "want[ed] to increase" her Lortab dose, which the record shows he declined to do.  (Doc. 12, p. 719)  Two months later, Dr. Sherley wrote on December 31, 2009 that plaintiff "had some old tramadol at home, and started taking it 4 times a day, and her mother gave her Lortab."  (Doc. 12, p. 710)  Dr. Ali's note on May 14, 2010, "no narcotics from me," suggests that plaintiff sought narcotics from him but he declined.  (Doc. 12, p. 236)

On April 18, 2011 Physician's Assistant Elizabeth Bruce, The Pain Management Group, noted that "[t]here was a recent change in medication by another provider add[ing] cyclobenzaprine 5 mg."  (Doc. 12, p. 946)  Plaintiff "denie[d] obtaining pain medication from sources outside The Pain Management Group."  (Doc. 12, p. 946)  On May 16, 2011, Dr. Timothy Miller, M.D., The Pain Management Group, again noted that plaintiff "denie[d] obtaining pain medication from sources outside the Pain Management group.  There was a recent change in medication by another

provider." (Doc. 12, p. 942) A random drug test was administered and plaintiff was advised that an abnormal test could "result in referral to an addiction specialist . . . ." (Doc. 12, p. 944)

On June 13, 2011, plaintiff "[a]dmit[ted] to using extra hydrocodone for abdominal pain" to Advance Practice Nurse (APN) Joelle Krizner, The Pain Management Group. (Doc. 12, p. 934) On June 13, 2001, Nurse Krizner wrote: "There was a recent change in medication by another provider . . . [t]he patient denies obtaining medication from sources outside the Pain Management Group, and "warned about using more . . . medications than prescribed." (Doc. 12, p. 937) That same day plaintiff requested an "increase in morphine." (Doc. 12, p. 930)

Dr. Johnson noted on July 20, 2011 that efforts were necessary to "minimize her usage of narcotics and maximize her usage of a home exercise program." (Doc. 12, p. 929) On August 9, 2011, plaintiff "[a]dmit[ted] to running out of lortab early because of taking extra." (Doc. 12, p. 923) Nurse Krizner referred her to an addictionologist. (Doc. 12, p. 926) On September 6, 2011, plaintiff again "[a]dmit[ted] overusing Lortab" (Doc. 12, p. 919), was again administered a drug test, and was again referred to an addictionologist (Doc. 12, p. 922). Nurse Krizner noted on September 6, 2011 that "[i]f patient remains non compliant with treatment plan will taper narcotics and discharge her." (Doc. 12, p. 922)

Finally, Dr. Heuman noted on March 16, 2012 that plaintiff "chronically takes narcotics for her [abdominal] pain." (Doc. 12, p. 987) Two months later, on May 10, 2012, plaintiff asked mental health provider Leah Pickett , Centerstone Mental Health, to "write her a script for hydrocodone for back pain." (Doc. 12, p. 1032) Ms. Pickett told plaintiff she "could not"do that. (Doc. 12, p. 1032)

A plain reading of the record supports the conclusion that the side effects of plaintiff's medications eventually were resolved, albeit by trial and error. However, even if plaintiff were able to identify side effects of specific medications that were not resolved, the record also supports the

conclusion that those side effects were attributable at least in part to plaintiff's long-term abuse of opiates and failure to comply with her prescriptions. Because the evidence supports both propositions, the ALJ did not err in giving "little weight" to Dr. Sherley's letter on this point. 42 U.S.C. § 405(g); *see McClanahan*, 744 F.3d at 833.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 21) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 9th day of February, 2015.


/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge